**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Daniel S. Guerra (State Bar No. 267559)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
dguerra@bursor.com

**SINDERBRAND LAW GROUP, P.C.**
Greg Sinderbrand (State Bar No. 179586)
2829 Townsgate Road, Suite 100
Westlake Village, CA 91361
Telephone: (818) 370-3912
E-mail: greg@sinderbrandlaw.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHAEL SELBY and CHRISTY CLIFFT, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BRAND EVANGELISTS FOR BEAUTY INC.,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiffs Michael Selby and Christy Clifft ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Brand Evangelists for Beauty Inc. ("Defendant" or "Inkey"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1. Plaintiffs bring claims on behalf of themselves and all others similarly situated who purchased Defendant's The INKEY List Exosome Hydro-Glow Complex (the "Product").

2. Defendant prominently represents that the Product delivers quantifiable, dramatic results on Amazon.com ("Amazon") and Defendant's The INKEY List website at theinkeylist.com ("Inkey Website" and together with Amazon the "Websites"), including but not limited to the following ("Advertised Claims"):

- "Plant-derived Exosomes help boost collagen production by 300%";
- "helps reduce inflammation by 55%";
- "improve[s] skin repair by 63% in eight hours[]";
- "up to 12 hours of hydration[]"; and
- "Skin rejuvenation in 14 days, clinically proven."[1]

3. But these claims, and others made by Defendant regarding the Product, are false and misleading. Scientific evidence conclusively demonstrates that the Advertised Claims about the Product's performance cannot be achieved by cosmetic ingredients at the concentrations used in over-the-counter formulations.

4. Accordingly, Plaintiffs bring claims against Defendant for violations of (1) California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*.; (2) California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.; (3) California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq*.; (4) Breach of Express Warranty; and (5) Unjust Enrichment.

[1] The Amazon webpage's advertisement contained an asterisk disclaimer stating in a "4 week clinical study of 26 people."

**PARTIES**

5. Plaintiff Michael Selby is a citizen of California and a resident of Antioch, California. Plaintiff Selby purchased the Product on January 17, 2026, from The INKEY List USA's website, for $22.00 (excluding tax). Prior to making his purchase, Plaintiff viewed and relied on Defendant's representations on the Inkey Website (including but not limited to the Advertised Claims). Plaintiff Selby saw these representations and warranties prior to and at the time of purchase. Thus, Plaintiff Selby reasonably relied on Defendant's representations when he decided to purchase the Product. Accordingly, these representations and warranties were part of the basis of the bargain in that Plaintiff Selby would not have purchased the Product on the same terms had he known that these representations and warranties were untrue. In making his purchase, Plaintiff Selby paid a price-premium due to Defendant's false and misleading Advertised Claims regarding the Product's purported ability to deliver dramatic youthful skin results. Plaintiff Selby, however, did not receive the benefit of the bargain because the Product's key ingredients cannot, in fact, deliver the Advertised Claims at their promoted concentrations and timeframes. Had Plaintiff Selby known that Defendant's representations and warranties about the Product were false and misleading, Plaintiff would not have purchased the Product or would have paid substantially less for it.

6. Plaintiff Christy Clifft is a citizen of California and a resident of Encino, California. Plaintiff Clifft purchased the Product on September 2, 2025, from Amazon, for $24.15 (including tax). Prior to making her purchase, Plaintiff Clifft viewed and relied on Defendant's representations that the Product could "boost collagen production by 300%," "improve skin repair by 63% in 8 hours," and provide "skin rejuvenation in 14 days, clinically proven," (including but not limited to the Advertised Claims). Plaintiff Clifft saw these representations and warranties prior to and at the time of purchase on Amazon and understood them to mean that the Product was clinically capable of delivering dramatic youthful skin results and visible skin rejuvenation within the advertised timelines. Thus, Plaintiff Clifft reasonably relied on Defendant's representations when she decided to purchase the Product. Accordingly, these representations and warranties were part of the basis of the bargain in that Plaintiff Clifft would not have purchased the Product on the

same terms had she known that these representations and warranties were false or misleading. In making her purchase, Plaintiff paid a price premium due to Defendant's false and misleading Advertised Claims regarding the Product's purported ability to deliver dramatic youthful skin results. Plaintiff Clifft, however, did not receive the benefit of the bargain because the Product's key ingredients, in the concentration levels present in the Product, cannot, in fact, deliver the Advertised Claims at their promoted concentrations and timeframes when topically applied to human skin under ordinary conditions of consumer use. Had Plaintiff Clifft known that Defendant's representations and warranties about the Product were false and misleading, Plaintiff would not have purchased the Product or would have paid substantially less for it.

7. Plaintiffs remain interested in purchasing the Product from Defendant in the future. Plaintiffs would purchase a reformulated version of the Product, or a version whose label accurately described its capabilities, if such a version were available. However, unless and until they can determine if the Product's benefits are accurately represented and marketed, Plaintiffs will be unable to rely on the truth of Defendant's labeling. So long as the Product is marketed and advertised to create dramatic results—including but not limited to "Boost[ing] collagen production by 300%" and "improv[ing] skin repair by 63% in just eight hours"—Plaintiffs will be unable to make informed decisions about whether to purchase the Product in the future and will be unable to evaluate the different prices between Defendant's Product and competitors' products. Plaintiffs will likewise be unable to rely on Defendant's marketing and representations going forward. Moreover, they are likely to be repeatedly misled by Defendant's conduct, unless and until Defendant is compelled to ensure that its marketing is accurate, non-misleading, and that its Product actually conforms to Defendant's marketed representations.

8. Defendant Brand Evangelists for Beauty Inc. is a Delaware corporation that does business under the brand name The INKEY List. Defendant manufactures, markets, and sells its Product throughout California and the United States, including through Amazon and the Inkey Website.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action where the aggregate claims of all members of the proposed Classes are in excess of $5,000,000.00, exclusive of interest and costs, and at least one member of the proposed Classes is a citizen of a state different from Defendant.

10. This Court has personal jurisdiction over Defendant because Defendant purposefully avails itself of the benefits of this forum by selling its Product to consumers, including Plaintiffs, in this forum. Defendant derives substantial revenue from the sale of its Product in this State, with knowledge that its Product is being marketed and sold for use in this State.

11. Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims took place within this District.

## FACTUAL ALLEGATIONS

### I. DEFENDANT MARKETS AND ADVERTISES THE PRODUCT TO DELIVER SPECIFIC, CLINICAL RESULTS

12. Defendant sells the Product nationwide and in California online through the Websites.

13. The Product is marketed throughout California and the United States (including online) as being able to achieve "professional" effects, including but not limited to those detailed in the Advertised Claims.[2]

14. Defendant markets the Product to highlight its key ingredients and the alleged highly effective skincare results it will ensure the Product provides. Specifically, on Amazon, Defendant claims the Product contains "3-million plant-based exosomes," bringing "clinic-first Exosome technology direct to your skincare routine" to "boost[] collagen production," in addition to containing "Prickly Pear Extract[,] … 1% Kollaren[,] … Hyaluronic Acid[,] and Ectoin."[3]

---

[2] *The INKEY List Hydro-Glow Complex, Enhances Skin Radiance, Rejuvanating [sic] Skincare, Advanced Hydration, Suitable For All Skin Types*, AMAZON, https://www.amazon.com/INKEY-List-Exosome-Hydro-Glow-Complex/dp/B0F195J88Z (last visited May 11, 2026).

[3] *Id.*

15. Defendant emphasizes that the "Plant-derived Exosomes help boost collagen production by 300%," and "improve[s] skin repair by 63% in 8 hours."[4]




POWERFUL INGREDIENTS - At 300x smaller than a pore, our plant-based Exosomes are the start ingredient and act as targeted messengers working deeper within the skin's surface. This breakthrough ingredient helps reduce inflammation by 55% and improve skin repair by 63% in 8 hours***. Supported by a powerful blend of Prickly Pear extract for gentle exfoliation and 1% Kollaren to increase firmness together with Hyaluronic Acid and Ectoin for barrier support and up to 12 hours of hydration**.




[4] Defendant's advertisement included a disclaimer stating "In-Vitro tests show that Cica Exosomes increase the genes related to collagen production by approximately 300%." *See id.*

16. Further, Defendant also advertises the Product to "perform like a daily professional facial."[5] Defendant claims the Product is "clinically proven to visibly boost glow, smooth and renew skin in just 14 days."[6]

17. Defendant also markets the Product to contain "a powerful blend of Prickly Pear extract for gentle exfoliation and 1% Kollaren to increase firmness together with Hyaluronic Acid and Ectoin for barrier support and up to 12 hours of hydration."[7]

18. The Product purports to deliver a "[c]linic-worthy facial glow, without the price tag."[8]




19. Throughout August and September of 2025, the Inkey Website contained similar advertisements on the Product's page.[9]

---

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] The archived August 27, 2025 webpage can be found on the Wayback Machine at https://web.archive.org/web/20250827032735/https://www.theinkeylist.com/products/exosome-hydro-glow-complex. The August 27, 2025 webpage contains the same misleading statements about the Product present in the September 15, 2025 webpage. *Compare id. with* https://web.archive.org/web/20250915191406/https://www.theinkeylist.com/products/exosome-hydro-glow-complex.


https://www.theinkeylist.com/products/exosome-hydro-glow-complex
16 captures
26 Mar 2025 - 29 May 2026
Go
JUN AUG OCT
27
2024 2025 2026
About this capture
Shop
Build Your Own Routine
SAVE 20%
Shop Skincare
Rewards
Exosome Hydro-Glow Complex
Visibly boost glow, smooth and renew skin
4.5 (708 Reviews)
$22.00 / 30ml
Resurface, rejuvenate, and hydrate your skin with Exosome Hydro-Glow Complex.
Powered by 3-million plant-derived Exosomes, this powerhouse collagen-boosting
Read more
30ml
Add to cart
Suitable for:
All skin types
Sensitive skin
Targets:
Dullness
Texture
Rejuvenation
Dehydration
Plant-derived Exosomes:
BOOST COLLAGEN BY 300%***
EXOSOME HYDRO-GLOW COMPLEX
1.0 US fl.oz / 30ml
Transformative serum for radiant, smooth and renewed skin
***In-Vitro tests show that Cica Exosomes increase the genes related to collagen production by approximately 300%, decrease inflammation by 55% and increase skin repair and renal by 63%.


3-MILLION PLANT-DERIVED EXOSOMES IN EVERY BOTTLE
BOOST COLLAGEN PRODUCTION BY 300%*
REDUCES INFLAMMATION BY 55%*
IMPROVES SKIN REPAIR BY 63% IN 8 HOURS*
***In-Vitro tests show that Cica Exosomes increase the genes related to collagen production by approximately 300%, decrease inflammation by 55% and increase skin repair and renal by 63%.




20. It was during this time that Plaintiff Selby accessed the Inkey Website, viewed the Advertised Claims and other misleading statements on the Inkey Website's Product page, and ultimately relied on them to purchase the Product from Defendant.

21. However, those claims are misleading.

## II. SCIENTIFIC EVIDENCE DISPROVES DEFENDANT'S ADVERTISED CLAIMS

22. Defendant's quantitative representations imply structural and functional modification of skin tissue that the Product simply cannot deliver as a topically applied serum.

23. Plant-derived exosome-like nanovesicles, such as the ones Defendant markets in the Product, "are a type of extracellular vesicle with a diameter ranging from 50-500 nm enriched with a variety of bioactive components, including lipids, proteins, RNA, and other effective small molecules."[10]

24. Exosomes in skincare first gained popularity as exosome therapy, or an in-office treatment involving the topical application of exosomes following microneedling or laser resurfacing treatments. "The microneedles create micro-sized pathways for a direct drug delivery

[10] Liu, H., Dong, T., Dong, C., Yang, F., Zhou, Q., Guan, C., and Wang, W., *Plant-derived exosome-like nanovesicles: a novel therapeutic perspective for skin diseases*, J. OF NANOBIOTECH., (2025) 23:640 at 3, available at https://doi.org/10.1186/s12951-025-03715-1.

into the skin skipping the skin barrier,"[11] thus allowing the exosomes to more effectively impart their bioactive cargo into the skin. JuveXO and Exovex are examples of exosome-infused product lines designed for in-office use after such procedures.

25. Most anti-aging clinical beneficial effects of exosomes in skincare have been seen in a different setting than the one here—not in a topical serum but as a follow-up application combined with prior microneedling or fractional laser procedures.[12]

26. Defendant's Advertised Claims regarding the Product raise a few glaring inconsistencies with scientific developments to date.

27. ***No FDA Approval.*** "There are currently no FDA-approved exosome products."[13] This means that the Product, while marketed to have the ability to alter the structure and boost the functions of the skin, is actually still sold as a cosmetic product that does not intrinsically promise the ability to do so, despite Defendant's extensive marketing representations and warranties to the contrary.

28. ***Exosome Versus Skin Barrier Size Constraints.*** Human skin is composed of two main layers: the epidermis and the dermis beneath. Beneath the dermis is the hypodermis, which is composed mainly of loose connective and fatty tissues.[14] The epidermis itself is made up of between four to five layers, depending on the location in the body.[15]

---

[11] Yang, et al., *Overcome the barriers of the skin: exosome therapy*, BIOMATERIALS RESEARCH, (2021) 25:22 at 5.

[12] *See* Pham, G.M., *Exosome-Based Therapeutics in Dermatology and Beyond: A Narrative Review*, BIOMEDICINES, 2026 Feb. 1;14(2):338 at 6-7, found at https://pmc.ncbi.nlm.nih.gov/articles/PMC12937894/pdf/biomedicines-14-00338.pdf (citing Park, G.H.; Kwon, H.H.; Seok, J.; Yang, S.H.; Lee, J.; Park, B.C.; Shin, E.; Park, K.Y., J., COSMET. DERMATOL. 2023, 22, 3418-3426).

[13] *Consumer Alert on Regenerative Medicine Products Including Stem Cells and Exosomes*, FDA (current as of Apr. 9, 2024), https://www.fda.gov/vaccines-blood-biologics/consumers-biologics/consumer-alert-regenerative-medicine-products-including-stem-cells-and-exosomes (last visited Apr. 22, 2026).

[14] *See 5.2 Layers of the Skin*, LIBRETEXTS, https://med.libretexts.org/Bookshelves/Anatomy_and_Physiology/Anatomy_and_Physiology_2e_%28OpenStax%29/02%3A_Support_and_Movement/05%3A_The_Integumentary_System/5.02%3A_Layers_of_the_Skin (last visited May 12, 2026).

[15] *See id.*

29. Other than on the palms of the hands and the soles of the feet, the epidermis' layers are, from deep to superficial: the stratum basale, stratum spinosum, stratum granulosum, and stratum corneum.[16]

30. The upper level of the skin barrier, the stratum corneum, is extremely good at keeping things from penetrating beneath it.[17] Exosomes, as with most topicals, struggle to get past this barrier in meaningful amounts due to their size in relation to the size of the openings at the stratum corneum.

31. Plant-based exosomes are much larger than mammalian-derived exosomes. Plant exosomes are approximately 50-500nm in size, while mammalian exosomes are 30-150nm.[18] The Product contains only "Cica Exosomes," which are derived from the Centella Asiatica plant,[19] and are thus larger than the average mammalian-derived exosomes.[20] Conspicuously, the majority of topical exosome studies to date have been conducted in vitro and have used mammalian exosomes, rather than the larger plant exosomes.

32. In general, a molecule must be under 500 Daltons in molecular weight to absorb into the human skin.[21] This is the generally accepted rule based on molecular weight. However, exosomes are more often characterized by their size and density rather than on their average molecular weight because exosomes are complex structures containing lipids, proteins, and nucleic acids, among other compounds.[22] Accordingly, there has been limited research conducted on the

---

[16] *See id.*

[17] *See* Liu, H., et al., at 1.

[18] *Id.* at 4.

[19] *See What is Centella Asiatica*, KBEAUTY STUDIO (Apr. 21, 2025), https://kbeautystudio.com/blogs/news/ingredient-spotlight-centella-asiatica-cica?srsltid=AfmBOopAqdj72VW7NyxsjADaGf_Pk5ppjJtAVMudKnluUXnwJ0f4IGPm.

[20] *Exosome Hydro-Glow Complex*, THE INKEY LIST, https://www.theinkeylist.com/products/exosome-hydro-glow-complex (last visited May 12, 2026).

[21] *See* Bos J.D., Meinardi M.M.H.M., *The 500 Dalton rule for the skin penetration of chemical compounds and drugs*, EXPERIMENTAL DERM. 2000: 9: 165-169, available at https://onlinelibrary.wiley.com/doi/epdf/10.1034/j.1600-0625.2000.009003165.x.

[22] *See* Sha, A., Luo, Y., Xiao, W., He, J., Chen, X., Xiong, Z., Peng, L., Zou, L., Liu, B., and Li, Q., *Plant-Derived Exosome-like Nanoparticles: A Comprehensive Overview of Their Composition, Biogenesis, Isolation, and Biological Applications*, INT. J. MOL. SCI. 2024 Nov. 11;25(22):12092, at 3-4, Table 1.

approximate nanometer size a plant-based exosomal nanoparticle must be to pass efficiently through the stratum corneum and into the layers of the epidermis.

33. The limited science supports a conclusion that the Product's plant-based exosomes are too large to efficiently pass through intact human epidermis. In a 2021 review of multiple studies, scientists determined that most data points indicated nanoparticles "with dimensions below 50 nm on intact skin" reached the epidermis at a rate of "between 1% and 10% of the applied dose."[23] This means that between 1% and 10% of exosomes 50 nm or smaller in size will pass through the stratum corneum. And plant-based exosomes are, on average, 50 nanometers in size *at their smallest*.[24]

34. Indeed, in one of the few studies that applied exosome solutions topically to unbroken human skin, the researchers found that "exosomes remain largely confined to the stratum corneum of human skin … as would be predicted from their liposome-like nature."[25] In these clinical studies, exosomes were derived from human umbilical cord mesenchymal stem cells, not plants as the Product claims to contain.[26] Very few, if any, studies have been conducted to test the efficacy of *plant* exosomes when topically applied to the unbroken stratum corneum. And plant exosomes are larger in size—likely too large to pass through the unbroken stratum corneum in effective amounts.

35. Yet Defendant's Advertised Claims all purport to act on and be based on clinical studies of plant-based exosome solutions applied topically to unbroken stratum corneum.

---

[23] Gimeno-Benito, I., Giusit, A., Dekkers, S., Haase, A., and Janer, G., *A review to support the derivation of a worst-case dermal penetration value for nanoparticles*, REG. TOXICOLOGY AND PHARMACOLOGY 119 (2021) 104836 at § 3.2.

[24] *See* Liu, H., et al., *Plant-derived exosome-like nanovesicles: a novel therapeutic perspective for skin diseases*, J. OF NANOBIOTECH., (2025) 23:640 at 4, available at https://doi.org/10.1186/s12951-025-03715-1.

[25] Zhang, B.; Lai, R.C. ; Sim, W.K. ; Choo, A.B.H.; Lane, E.B.; Lim, S.K.; *Topical Application of Mesenchymal Stem Cell Exosomes Alleviates the Imiquimod Induced Psoriasis-Like Inflammation*, INT'L J. OF MOL. SCIS., (2021) JAN. 13; 22(2):720, at 7, found at https://pmc.ncbi.nlm.nih.gov/articles/PMC7828312/pdf/ijms-22-00720.pdf.

[26] *See* Zhang, B. *et al.*; *see also* Ding, D., Shyu, W., Lin, S., *Mesenchymal stem cells*, SAGE J., first published online Feb. 1, 2011, available at https://journals.sagepub.com/doi/10.3727/096368910X ("Mesenchymal stem cells (MSCs) are stromal cells that have the ability to self-renew and also exhibit multilineage differentiation. MSCs can be isolated from a variety of tissues, such as umbilical cord, endometrial polyps, menses blood, bone marrow, adipose tissue, etc.").

36. ***Exosomes Cannot Bypass The Skin Barrier In Large Enough Amounts To Contribute To Visible Collagen Production Rate Increases.*** In addition to plant exosomes' questionable ability to penetrate the topmost layer—stratum corneum—of the four layers of the epidermis, the Product's Advertised Claims are problematic because the same plant exosomes that cannot pass through the epidermis also cannot reach the skin layer *beneath* the epidermis, the dermis. This is significant because collagen production occurs at the dermis level, and the Product must necessarily reach the dermis to stimulate collagen production. Thus, Defendant's specific advertisements of boosting collagen by 300% and "improv[ing] skin repair by 63% in 8 hours" are misleading.[27]

37. Collagen in the skin "is produced, organized, and maintained by dermal fibroblasts."[28] Fibroblasts are located in the two layers of the dermis, the skin layer beneath the four-to-five layers of epidermis.[29] Fibroblasts that create collagen are known to reside in both the papillary and reticular layers of the dermis.[30]

38. Notably, collagen synthesis is not an instantaneous process. It is a multi-step biological undertaking that involves gene expressions, protein assembly, hydroxylation of specific residues of proline and lysine in the nascent collagen by enzymes, and, eventually, tissue

---

[27] *See The INKEY List Hydro-Glow Complex, Enhances Skin Radiance, Rejuvanating [sic] Skincare, Advanced Hydration, Suitable For All Skin Types*, AMAZON, https://www.amazon.com/INKEY-List-Exosome-Hydro-Glow-Complex/dp/B0F195J88Z (last visited May 11, 2026).

[28] *See* Qin, Z., Voorhees, J., Fisher, G., and Quan, T., *Age-associated reduction of cellular spreading/mechanical force up-regulates matrix metalloproteinase-1 expression and collagen fibril fragmentation via c-Jun/AP-1 in human dermal fibroblasts*, AGING CELL (2014) 13, pp1028-1037 at 1028.

[29] *See 5.2 Layers of the Skin*, LIBRETEXTS HEALTH, https://med.libretexts.org/Bookshelves/Anatomy_and_Physiology/Anatomy_and_Physiology_2e_%28OpenStax%29/02%3A_Support_and_Movement/05%3A_The_Integumentary_System/5.02%3A_Layers_of_the_Skin (last visited May 12, 2026).

[30] *See* Tajima, S., and Pinnell, S.R., *Collagen Synthesis by Human Skin Fibroblasts in Culture: Studies of Fibroblasts Explanted from Papillary and Reticular Dermis*, J. INVESTIGATIVE DERM., 77:410-412, 1981, available at https://www.jidonline.org/article/S0022-202X(15)46224-4/pdf (last visited May 12, 2026).

remodeling through the alignment of collagen chains in the formation of the characteristic collagen triple helix.[31]

39. In wounded skin, where dermal fibroblasts migrate to the wound opening and are therefore more concentrated and are present at much higher rates than they are in unwounded skin, collagen synthesis takes anywhere from a week to several weeks or even years.[32] In unbroken skin, dermal fibroblasts are more spaced out in the dermis layer and thus are present in much lower numbers in any given area, which leads to lower collagen synthesis rates.[33] Accordingly, Defendant's Advertised Claim that the Product "improve[s] skin repair by 63% in 8 hours" is scientifically impossible in the context of a topical formula applied to unbroken stratum corneum, which is how the Product is to be used.

40. In sum, Defendant's Advertised Claims are scientifically implausible. Even assuming against all scientific odds that the 1% cica exosomes contained within the Product did manage to penetrate all layers of the epidermis and reach the fibroblasts in the dermis, Defendant's Advertised Claim that "collagen production" is "boost[ed] by 300%" still requires a sufficiently large proportion of the exosomes to have made it through to activate the fibroblasts, and then sufficient time after the fibroblasts are activated for collagen production to be visible to the naked eye to have been "boost[ed] by 300%."

41. Yet based purely on the size of the plant exosomes contained in the Product, studies have shown that *at most*, 10% applied topically make it through the stratum corneum to the other layers of the epidermis. And an even more minuscule proportion would make it through the epidermis to the dermis. Whatever that minute proportion is, it is too small to have the capacity to

---

[31] *See* Last, J.A., and Reiser, K.M., *Collagen Biosynthesis*, ENVIRONMENTAL HEALTH PERSPECTIVES Vol. 55, pp.169-177, 1984, at 170-72, available at https://pmc.ncbi.nlm.nih.gov/articles/PMC1568368/pdf/envhper00449-0171.pdf.

[32] *See 24.4: Wound Healing*, LIBRETEXTS HEALTH, https://med.libretexts.org/Bookshelves/Nursing/Fundamentals_of_Nursing_%28OpenStax%29/24%253A_Skin_Integrity/24.04%253A_Wound_Healing (last visited May 12, 2026).

[33] *See id.*

stimulate the dermal fibroblasts within users' skin to create a 300% increase in collagen production, "repair" skin by "63% in 8 hours," or to "rejuvenat[e]" skin in "14 days."[34]

42. ***Stability Constraints.*** Basic science further shows Defendant's Product is incapable of maintaining the stabilization needed to deliver advertised results. Plant exosomes "are temperature-sensitive, necessitating storage at -80 °C to preserve their bioactivity."[35] And Defendant never discusses the storage requirements of the Product. Thus, reasonable consumers would and likely do store the Product at room temperature.

43. While certain "cryoprotectants such as trehalose, DMSO, and glycerol" have been "proposed to enhance stability, … little is known about the significance or effectiveness of these methods."[36] Indeed, a 2025 study stated that "[s]ince topical dermatological formulations typically require storage at ambient conditions and have extended shelf lives, it is crucial that future research focuses on developing strategies to enhance stability and create delivery systems specifically designed for practical application contexts."[37]

44. In short, as of 2025, no research has yet shown how to preserve the bioactivity of topical products containing plant-derived exosomes in conditions outside of -80 °C. Here, Defendant certainly does not sell the Product as having maintained that frozen state, nor does Defendant ensure that the Product is shipped at that temperature or make reasonable consumers aware that maintaining the Product at a temperature of -80 °C is fundamental for the Product's function and delivery through the Advertised Claims.

45. Although Defendant is best situated to know the true composition of its Product, to the extent necessary, Plaintiffs have satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity:

---

[34] *The INKEY List Hydro-Glow Complex, Enhances Skin Radiance, Rejuvanating [sic] Skincare, Advanced Hydration, Suitable For All Skin Types*, AMAZON, https://www.amazon.com /INKEY-List-Exosome-Hydro-Glow-Complex/dp/B0F195J88Z (last visited May 11, 2026).

[35] Liu, H., Dong, T., Dong, C., Yang, F., Zhou, Q., Guan, C., and Wang, W., *Plant-derived exosome-like nanovesicles: a novel therapeutic perspective for skin diseases*, J. OF NANOBIOTECH., (2025) 23:640 at 22, available at https://doi.org/10.1186/s12951-025-03715-1.

[36] *Id.*

[37] *Id.*

a) **WHO:** Defendant Brand Evangelists for Beauty Inc.

b) **WHAT:** Defendant's conduct here was, and continues to be, fraudulent because Defendant intentionally marketed and advertised the Product to be capable of delivering scientifically impossible results in given timelines. These false and misleading representations were material to Plaintiffs and the Classes because they would not have paid the same amount for the Product or would not have purchased the Product at all had they known the Product was incapable of delivering the skin benefits promised in the Advertised Claims at their marketed timelines. Defendant knew or should have known that this information is material to reasonable consumers, including Plaintiffs and Class Members, in making their purchasing decisions, given its strategic phrasing of the Advertised Claims to be clinically based results and Defendant's expertise, as described above, yet it continued to pervasively market the Product in this manner in California and the United States.

c) **WHEN:** Defendant made material misrepresentations and omissions to Plaintiffs and the members of the Classes during the putative class period, including prior to and at the time of purchase, despite its knowledge that the Product could not, in fact, produce the promised clinical results at their specified timelines. Plaintiffs and Class Members viewed the packaging of the Product when purchasing and viewed the representations and warranties made by Defendant and understood them to mean that the Product could, in fact, deliver on the Advertised Claims as marketed.

d) **WHERE:** Defendant made material misrepresentations and omissions on the Websites for the Product.

e) **HOW:** Defendant made material misrepresentations and omissions of fact regarding the Product by representing and warranting that the Product could deliver skin benefits such as those specified in the Advertised Claims, including but not limited to boosting the production of collagen by 300% and improving skin repair by 63% in 8 hours. Defendant, on the Websites, omitted material disclosures to consumers about the true scientifically backed capabilities of the Product.

f) **INJURY:** Plaintiffs and members of the Classes purchased, and paid a premium (up to the full purchase price), or otherwise paid more for the Product than they would have, or alternatively they would not have purchased the Product at all, absent Defendant's misrepresentations and omissions.

## CLASS ALLEGATIONS

46. Plaintiffs bring this action on behalf of themselves and two Classes of all others similarly situated pursuant to Federal Rules of Civil Procedure 23, defined respectively as:

***Nationwide Class***: All persons in the United States who, during the maximum period of time permitted by law, purchased the Product through the Websites (the "Nationwide Class").

***California Subclass:*** All persons in California who, during the maximum period of time permitted by the law, purchased the Product through the Websites (the "California Subclass", together with the Nationwide Class, "the Classes").

47. The Classes do not include (1) Defendant, its officers, and/or directors; (2) the Judge and/or Magistrate to whom this case is assigned; (3) the Judge or Magistrate's staff and family; and (4) Plaintiffs' counsel and Defendant's counsel.

48. Plaintiffs reserve the right to amend the above class definitions and add additional classes and subclasses as appropriate based on investigation, discovery, and the specific theories of liability.

49. ***Community of Interest:*** There is a well-defined community of interest among Members of the Classes, and the disposition of the claims of these Members of the Classes in a single action will provide substantial benefits to all parties and to the Court.

50. ***Numerosity*:** While the exact number of members of the Classes is unknown to Plaintiffs at this time, and can only be determined by appropriate discovery, upon information and belief, members of the Classes number in the millions. Members of the Classes may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

51. ***Existence and Predominance of Common Questions of Law and Fact*:** Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individuals of the Classes. These common legal and factual questions include, but are not limited to:

(a) Whether Defendant's Advertised Claims regarding the Product were scientifically impossible to achieve;

(b) Whether reasonable consumers would understand Defendant's representations and warranties concerning the efficacy of the Product—including but not limited to the Advertised Claims on the Websites—were untrue and misleading;

(c) Whether Defendant's representations and warranties on the Websites regarding its Product were material;

(d) Whether Defendant was unjustly enriched as a result of its unlawful conduct as alleged in this Complaint;

(e) Whether Defendant violated California's Consumers Legal Remedies Act, ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*;

(f) Whether Defendant violated California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*; and

(g) Whether Defendant violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*

52. ***Typicality:*** The claims of the named Plaintiffs are typical of the claims of other members of the Classes in that the named Plaintiffs were exposed to Defendant's false and misleading advertising about the efficacy of the Product, purchased the misleadingly advertised Product in reliance on those representations and warranties, and suffered a loss as a result of that purchase.

53. ***Adequacy:*** Plaintiffs will fairly and adequately represent and protect the interests of the Classes as required by Fed. R. Civ. P. 23(a)(4). Plaintiffs are adequate representatives of the Classes because they have no interests adverse to the interest of the Members of the Classes. Plaintiffs are committed to the vigorous prosecution of this action, and, to that end, have retained skilled and experienced counsel.

54. ***Superiority:*** A class action is superior to all other available methods for the fair and efficient adjudication of the claims asserted in this action because the expense and burden of individual litigation make it economically unfeasible for members of the Classes to seek redress of their claims other than through the procedure of a class action. In addition, even if Class Members could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments, and would magnify the delay and expense to all parties and to the court system, resulting in multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents fewer management difficulties, conserves the resources of the parties and of the court system and protects the rights of each Member of the Classes. Plaintiffs anticipate no difficulty in the management of this action as a class action. Class-wide relief is essential to compel compliance with California's consumer

protection laws. If separate actions were brought by individual members of the Classes, Defendant could be subject to inconsistent obligations.

## CAUSES OF ACTION

### COUNT I

**Violation of California's Consumers Legal Remedies Act ("CLRA"),**
**Cal. Civ. Code § 1750, *et seq.***
**(On Behalf of Plaintiffs and the California Subclass)**

55. Plaintiffs incorporate by reference each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

56. Plaintiffs bring this claim individually and on behalf of the California Subclass against Defendant.

57. Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."

58. Civil Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

59. Civil Code § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

60. Defendant profited from the sale of the falsely, deceptively, and unlawfully advertised Product to unwary consumers on the Websites by advertising that the Product was capable of scientifically impossible skin benefits and changes within certain timelines.

61. Defendant's wrongful business practices constituted, and still constitute, a continuing course of conduct in violation of the CLRA.

62. On March 2, 2026, prior to filing this action, Plaintiffs Clifft and Selby sent a pre-suit notice letter pursuant to CLRA § 1782. The letter was sent via certified mail, return receipt requested, and provided notice of Defendant's violation of the CLRA and demanded that

Defendant correct the unlawful, unfair, false and/or deceptive practices alleged herein. Defendant failed to remedy the issues raised in the letter.

63. Plaintiffs and the California Subclass seek (1) actual and punitive damages, (2) restitution, (3) reasonable costs and attorneys' fees, and (4) to enjoin the unlawful acts and practices described herein pursuant to Cal. Civ. Code § 1780.

**COUNT II**
**Violation of California's Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(On Behalf of the Plaintiffs and the California Subclass)**

64. Plaintiffs hereby incorporate by reference and re-allege herein the allegations contained in all preceding paragraphs of this Complaint.

65. Plaintiffs bring this claim individually and on behalf of the Members of the California Subclass against Defendant.

66. Defendant violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§17200-17210, by engaging in unfair, fraudulent, and unlawful business practices.

67. Plaintiffs have standing to pursue this claim because they both suffered an injury-in-fact and lost money or property as a result of Defendant's unlawful, unfair, and fraudulent conduct. Specifically, Plaintiffs purchased the Product for their personal use. In so doing, Plaintiffs relied upon Defendant's false representations of the Product's efficacy—including but not limited to the Advertised Claims—when the Product was actually scientifically incapable of delivering upon those falsely marketed claims. Plaintiffs spent money in the transactions that they otherwise would not have spent had they known the truth about Defendant's advertising claims.

68. Plaintiffs and the California Subclass lack an adequate remedy at law for the equitable relief sought under the UCL—and, as alleged in the corresponding counts, under the FAL and CLRA. Legal damages and equitable restitution are not equivalent: restitution is measured by the gains Defendant unlawfully obtained and may be awarded even where damages cannot be established with the certainty the law requires, and a court may order Defendant to disgorge revenues that would not be recoverable as legal damages. Moreover, only prospective equitable relief can redress the ongoing and threatened injury alleged above, because Plaintiffs are interested

in purchasing the Product in the future but cannot rely on Defendant's representations so long as the unlawful conduct continues.

69. The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act." Cal. Bus. & Prof. Code § 17200. A business act or practice is "unlawful" if it violates any established state or federal law. A practice is unfair if it (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL. Cal. Bus. & Prof. Code § 17204. Such a person may bring such an action on behalf of himself or herself and others similarly situated who are affected by the unlawful and/or unfair business practice or act.

70. Defendant's acts, as described above, constitute unlawful, unfair, and fraudulent business practices pursuant to California Business & Professions Code §§ 17200, *et seq*.

71. Defendant acted with knowledge and intent.

72. Plaintiffs allege a claim under all three prongs of the UCL.

73. As alleged above, Defendant engaged in fraudulent conduct that had the tendency or capacity to deceive or confuse reasonable consumers.

74. Defendant violated the UCL's proscription against engaging in **Unlawful Business Practices** through its violations of the FAL, Cal. Bus. & Prof. Code § 17500, *et seq.* and CLRA, Cal. Civ. Code § 1770(a)(5) and (a)(7) as alleged above.

75. Defendant has also violated the UCL's proscription against engaging in **Unfair Business Practices**. Defendant's acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200, *et seq.* in that Defendant's conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct. Defendant's deceptive Advertised Claims have misled consumers into purchasing the Product over other truthfully labeled competitors.

76. Plaintiffs and the California Subclass suffered substantial injury by virtue of buying the Product that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omissions on the Websites about the purported benefits of the Product.

77. There is no benefit to consumers or competition from deceptively marketing that the Product is capable of achieving the Advertised Claims within certain quantifiable promised timelines when it is scientifically incapable of doing so.

78. The gravity of the consequences of Defendant's conduct as described above outweigh any justification, motive, or reason therefor, particularly considering the available legal alternatives which exist in the marketplace. Such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiffs and the other members of the California Subclass.

79. Plaintiffs and the California Subclass could not have reasonably avoided their injury or known that the Product's prominent marketing of the false representations, including but not limited to the Advertised Claims, were scientifically impossible of being met. As such, they could not have reasonably avoided the injury they suffered.

80. Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs and the Subclass seek an order of this Court that includes, but is not limited to, requiring Defendant to (a) provide restitution to Plaintiffs and the other members of the Subclass; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiffs' attorneys' fees and costs.

## COUNT III

**Violation of California's False Advertising Law**
**Cal. Bus. & Prof. Code § 17500**
**(On Behalf of Plaintiffs and the California Subclass)**

81. Plaintiffs hereby incorporate the foregoing allegations as if fully set forth herein.

82. Plaintiffs bring this claim individually and on behalf of the California Subclass against Defendant.

83. Defendant's acts and practices, as described herein, have deceived and/or are likely to continue to deceive Plaintiffs, members of the California Subclass, and the public. As described

throughout this Complaint, Defendant misrepresents that the Product is capable of helping users achieve the skin benefits marketed in the Advertised Claims and in other representations Defendant uses to market the Product's efficacy on the Websites, when in fact, the Product is incapable of doing so based on science.

84. By Defendant's actions, it has disseminated uniform advertising, including but not limited to the Advertised Claims, regarding the Product across California and the United States. The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq*. Such advertisements were intended to and likely did deceive the consuming public.

85. The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive in that Defendant affirmatively represents that the Product is capable of achieving the benefits within the timeframes promised in the Advertised Claims.

86. In making and disseminating these statements, Defendant knew, or should have known, that its advertising was untrue and misleading in violation of California law. Plaintiffs and the members of the California Subclass based their purchasing decisions on Defendant's material false and misleading representations and warranties about the composition of its Product. Plaintiffs and the California Subclass were injured in fact and lost money and property as a result, in an amount to be proven at trial.

87. The misrepresentations by Defendant of the material facts described and detailed above herein constitute false and misleading advertising and, therefore, constitute a violation of Cal. Bus. & Prof. Code § 17500, *et seq.*

88. Accordingly, Plaintiffs and the California Subclass seek all monetary and non-monetary relief allowed by law, including (a) restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; (b) declaratory relief; (c) reasonable attorneys' fees and costs under Cal. Code Civ. Proc. §1021.5; and (d) injunctive relief, and other appropriate equitable relief.

**COUNT IV**
**Breach of Express Warranty**
**(On Behalf of Plaintiffs and the Classes)**

89. Plaintiffs hereby incorporate the foregoing paragraphs as if fully stated herein.

90. Plaintiffs bring this claim individually and on behalf of the Classes against Defendant.

91. Plaintiffs bring this claim under the laws of the State of California.

92. Plaintiffs and the California Subclass provided Defendant with timely notice of its breach of express warranty. As alleged above, on March 2, 2026, prior to filing this action, Plaintiffs sent Defendant a pre-suit notice letter by certified mail, return receipt requested, that identified the Advertised Claims, explained why the Product does not conform to them, and demanded that Defendant cure. Defendant failed to cure within a reasonable time. To the extent any further notice is required, it is excused as futile given Defendant's continued dissemination of the Advertised Claims.

93. Plaintiffs and the Members of the Classes formed a contract with Defendant at the time Plaintiffs and Class Members purchased the Product.

94. The terms of the contract include the promises and affirmations of fact made by Defendant in advertising the Product, including but not limited to the Advertised Claims.

95. This labeling and advertising constitute express warranties and became part of the basis of the bargain and part of the standardized contract between Plaintiffs and the Members of the Classes and Defendant.

96. As set forth above, Defendant purports through its labeling, marketing, and packaging, to create an express warranty that the Product is capable of achieving the skin benefits marketed in the Advertised Claims. However, Defendant breached its express warranties about the Product because the science denotes the impossibility of the Advertised Claims, thereby rendering Defendant's representations regarding the Product—including but not limited to the Advertised Claims—false and misleading. Simply put, the Product does not perform up to Defendant's representations and warranties.

97. Plaintiffs and the Members of the Classes performed all conditions precedent to Defendant's liability under this contract when they purchased the Product.

98. Plaintiffs and the Members of the Classes would not have purchased the Product had they known its true nature.

99. As a result of Defendant's breach of express warranty, Plaintiffs and each member of the Classes suffered financial damage and injury as a result and are entitled to damages, in addition to costs, interest and fees, and attorneys' fees, as allowed by law.

**COUNT V**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Classes)**

100. Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

101. Plaintiffs bring this claim individually and on behalf of the members of the Classes against Defendant.

102. This claim is brought in the alternative to the extent permitted by Fed. R. Civ. P. 8.

103. Plaintiffs and the Classes conferred a benefit on Defendant in the form of monies paid to purchase Defendant's Product.

104. Defendant voluntarily accepted and retained this benefit.

105. Because this benefit was obtained unlawfully, namely by selling and accepting compensation for the Product which was misbranded and not as advertised, it would be unjust and inequitable for the Defendant to retain monies received from selling its falsely advertised Product.

106. Plaintiffs and the members of the Classes do not have an adequate remedy at law and plead their claim for unjust enrichment in the alternative to their legal claims. Legal remedies available to Plaintiffs and the members of the Classes are inadequate because they are not equally prompt and certain and in other ways as efficient as equitable relief. Damages are not as equally certain as restitution because the standard that governs restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiffs failed to sufficiently adduce evidence to support an award of damages. Damages and restitution

are not the same amount. Equitable relief, including restitution, entitles Plaintiffs to recover all profits from the wrongdoing, which may exceed the available damages at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant as follows:

a) For an order certifying the Classes under Fed. R. Civ. P. 23 and naming Plaintiffs as representatives of the Classes, and Plaintiffs' Counsel as Class Counsel;

b) For an order declaring that Defendant's conduct violates each of the statutes referenced herein;

c) For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

d) For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

e) For prejudgment interest on all amounts awarded;

f) For an order of restitution and all other forms of equitable monetary relief;

g) For injunctive relief as pleaded or as the Court may deem proper; and

h) For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated: June 16, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: /s/ *L. Timothy Fisher*

L. Timothy Fisher (State Bar No. 191626)
Daniel S. Guerra (State Bar No. 267559)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
dguerra@bursor.com

**SINDERBRAND LAW GROUP, P.C.**
Greg Sinderbrand (State Bar No. 179586)
2829 Townsgate Road, Suite 100
Westlake Village, CA 91361
Telephone: (818) 370-3912
E-mail: greg@sinderbrandlaw.com

*Attorneys for Plaintiffs*

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, L. Timothy Fisher, declare as follows:

1. I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court. I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiff Michael Selby who currently resides in Antioch, California, and for Plaintiff Christy Clifft who currently resides in Encino, California. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2. The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Northern District of California. Additionally, Defendant transacts substantial business in this District, including sales of the Product at issue, and Defendant advertised and marketed the Product at issue to Plaintiffs who then each purchased the Product in this District.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Walnut Creek, California on June 16, 2026.

*/s/ L. Timothy Fisher*
L. Timothy Fisher